Marc P. Friedman
OSB #89244
Law Office of Marc P. Friedman, P.C.
P.O. Box 11167
245 W. 13th Ave.
Eugene, OR 97440
(541) 686-4890
(541) 344-6254 Fax
mpfriedma@yahoo.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| Plaintiff, | ) | NO. CR 06- 60070-AA |
| | ) | |
| vs. | ) | DEFENDANT KEVIN TUBBS' |
| | ) | MEMORANDUM ON THE |
| KEVIN TUBBS | ) | APPLICATION OF U.S.S.G. §3A1.4 |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

INTRODUCTION:

KEVIN TUBBS IS NOT A TERRORIST. He should not be considered a terrorist and must not be treated as one. He committed crimes and for these crimes he knows he must and will be punished. But under any legal definition or common sense usage of the word, or for any practical reason, Kevin Tubbs is not a terrorist. Contrary to what the government may argue and the political policies pushing for this treatment, Kevin Tubbs is not a terrorist.

DEFENDANT KEVIN TUBBS' MEMORANDUM ON THE APPLICATION OF U.S.S.G. §3A1.4

His conduct was criminal.  He and his co-defendants are responsible for significant property damage.   Without ceding to the political winds, and without stretching the law to embrace the conduct for which Mr. Tubbs is responsible this court cannot find, that he is subject to the terrorism enhancement.

Kevin Tubbs was motivated by love, empathy and respect for the creatures that could not defend themselves.   He acted from his devotion to animals and a goal to speak for the creatures that cannot speak for themselves.  His acts were ones of desperation and an overwhelming feeling of despair, and his only motivation was the hope of saving our earth from destruction and degradation.  As AUSA Engdall put it, Mr. Tubbs was acting "to save the planet for our children and grandchildren."  (*The Rise and Fall of the Eco-Radical Underground,* Rolling Stone Magazine*,* August 10, 2006 p. 73) While the tactics in which he found himself embroiled were misguided, his intention was to call attention to the misconduct he perceived, not to stop the course of government or interfere with the conduct of private business.  The actions in which he participated were a response to the perceived misdeeds and injustice upon animals and the living earth.  His was a cry for help arising from frustration and a feeling of powerlessness.  These were not acts of vengeance or hate.  Nor was or is Kevin Tubbs an individual who ever sought to cause injury or harm to any living creature.  And **never** was a single person or animal harmed in the course of all

the actions in which he was a participant or any one else.  Such care and thought was no accident, but integral to the manner and means of these actions.   The methods used were misguided, but these were not acts of terrorism.   None of the actions and actors now before this court ever engaged in any activity in which the aim was to injure any individual.  Even the government concedes that the only argument that can be made is that there was a theoretical potential of harm to first responders.[1]  But no harm ever occurred to anyone, and has never occurred in the history of ALF and ELF actions.

A terrorist acts from hate and aims to create fear.   A terrorist seeks to create an environment in which the populace lives in fear; in which the institutions of government are moved to redirect resources and the patterns of personal behavior are altered.  A terrorist's goal is to cause death, because death is the ultimate tool.  Death is the ultimate source of fear.  Hatred is the motive.   A terrorist has contempt for the lives of his enemies.[2]  The terrorist wishes only the death and the destruction of his enemy and their institutions and government.   The government, and in particular this administration's, use of the term "eco-terrorism" and their efforts to tie these actions to domestic terrorism is misplaced.   It seeks to place the actions of a loose group of animal rights and environmental activists on par with Timothy

---

[1] "Meyerhoff advised that it had never been their intent to hurt anybody or the firefighters."  (Meyerhoff 302 p. 59 8-9,

DEFENDANT KEVIN TUBBS' MEMORANDUM  ON THE APPLICATION OF U.S.S.G. §3A1.4

McVeigh, and Al Qaeda.  Even Ted Kaczynski was not considered a terrorist.

The goal of labeling an individual a terrorist and imposing the terrorism enhancement is to impose a sentence of sufficient length and require terms of confinement of such harshness that these individuals will be safely locked away from society so that the beliefs and goals of the terrorist are unable to cause further harm.  The underlying presumption is that such an individual possesses an on going threat to society that cannot otherwise be deterred.   Kevin Tubbs is not such an individual.

In *United States v. Meskini*, the Second Circuit held that Congress and the Sentencing Commission had a rational reason for creating §3A1.4, "Because terrorists . . . are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation and the need for incapacitation. . . ." 319 F.3d 88, 92 (2d Cir. 2003).

Were we even to presume Mr. Tubbs is guilty of terrorism, which we maintain he is not, none of the aforementioned reasons stated by Congress or the Sentencing Commission apply to Mr. Tubbs.  The likelihood of recidivism is most minimal; Mr. Tubbs lived almost five years from the time of his last action until his arrest without engaging in any activity similar to that with which he is charged.  Mr. Tubbs also

---

see also CW302 p. 60 14-17)

DEFENDANT KEVIN TUBBS' MEMORANDUM  ON THE APPLICATION OF U.S.S.G. §3A1.4
Page 4

declined to attend and avoided all related gatherings, groups and "book club" meetings where such criminal activity may have been discussed. If these peaceful and uneventful years are not evidence enough of his ability to be rehabilitated and the low likelihood of recidivism, all doubt was removed on April 29, 2005 when FBI informant Jacob Ferguson, wearing an FBI wire and pretending he may need help with another illegal direct action, asked Mr. Tubbs if he would ever participate in another action again. To this, Mr. Tubbs simply shook his head "no" and answered, "No, it's not worth it," letting Ferguson know in no uncertain terms that he would never participate in any illegal direct action again. As for the "difficulty of rehabilitation," we merely need to look at his life following his final action in 2001 to see that he has fully and successfully turned his life around.

Since 2001, Mr. Tubbs has maintained full-time employment working 45-60 hours per week, receiving raises and promotions until he became the full-time assistant manager at his store. He became engaged to be married and started planning a wedding. He bought a house with his fiancée and settled down. They bought a new car and adopted more cats. Mr. Tubbs began to find peaceful and lawful ways to help others, such as organizing food drives for the Lane County Food Bank and Greenhill Humane Society. He and his fiancée were planning on having

---

[2] "Avalon does not burn targeted building because of the presence of hunters/humans" (Meyerhoff 302 p. 153, 22-25)

DEFENDANT KEVIN TUBBS' MEMORANDUM ON THE APPLICATION OF U.S.S.G. §3A1.4

children and starting their own family; the ultimate sign that he was through with direct action.  Clearly, Mr. Tubbs turned his life around and is not one who will face the "difficulty of rehabilitation."

With regard to the need for incapacitation, Mr. Tubbs' last four and a half years of living quietly, peacefully and productively in the community is proof-positive there is no need for such extreme incapacitation.  As AUSA Engdall has stated, ". . . this individual has moved away from the movement and has been law abiding and that makes a difference."  Understandably, Mr. Tubbs will serve prison time as punishment for the role he played assisting in the direct actions; nevertheless,  he has already proven to himself, to the community and to this Court, however, that "incapacitation" to prevent further criminal activity is neither necessary nor applicable.  Again we maintain that Kevin Tubbs is not a terrorist nor does §3A1.4 apply to him.

The application of U.S.S.G. §3A1.4 has been selectively and discriminately applied across the country, as evidenced by the failure to apply the enhancement in *United States v. Cloyd, United States v. DeBusk and United States v. Moseley*, the recent Alabama church arson cases.  The enhancement was not applied in the serial arson case of *United States v. Meredith* involving approximately three dozen fires set on federal land requiring more than 600 fire fighters.  The enhancement has not

been applied to KKK arsons or abortion clinic bombings.

Currently, two young women associated with these defendants pled guilty to arson for their roles in the arson of the University of Washington Horticultural Center in Seattle. This action was the sister-action of the arson at Jefferson Poplar Farm in Clatskanie, Oregon. The ideas and plans were discussed and formulated at the same time in the same place by both the University of Washington Defendants as well as several of the defendants in front of this Court. And, of course, the actions were basically the same; the arson of a vacant structure with the goal of helping the environment. Nevertheless, the defendants in Washington do not face an enhancement of their sentences under §3A1.4. Their crime was the same, the intent was the same and the cause was the same. The only difference is the indictment of that crime in a different jurisdiction than this one.

Only the defendants charged in the District of Oregon face the "terrorist enhancement." If these cases were being tried in state courts, there might be some rationale for disparate treatment of the cases, but all of these cases fall under the same federal umbrella. In relation to the criminal investigation, one can only conclude that this "terrorist enhancement" is being selectively and arbitrarily applied.

For the reasons noted above, and based upon the paucity of law surrounding this issue, we join the memoranda and arguments of counsel for all co-defendants with regard to the application of Sentencing Guideline §3A1.4, otherwise known as the "terrorist enhancement." In particular, we wish to focus on three distinctly critical issues raised by the application of U.S.S.G. §3A1.4: First, we argue that, for §3A1.4 to apply, the defendant must be convicted of a crime enumerated in 18 U.S.C. §2332b(g)(5). Second, this court must require proof of each factor giving rise to an application of §3A1.4 beyond a reasonable doubt, or at the very least, by clear and convincing evidence. Third, we argue that the definition contained in 18 U.S.C. §2332b(g)(5) cannot be taken out of context of §2332b as a whole. Finally, even if this Court determines that §§3A1.4 technically applies to Kevin Tubbs, this Court also has the discretion, authority and support of the United States Supreme Court to refuse to apply the enhancement in cases such as this one, where the facts take the case out of the heartland of §3A1.4.

**ISSUE ONE**                      **The Terrorist Enhancement**

The District Court is not bound by precedent on when to apply §3A1.4. Absent binding authority on the issue, Mr. Tubbs argues that §3A1.4 requires a conviction of one of the enumerated crimes contained in §2332b(g)(5).

Neither the United States Supreme Court nor the Ninth Circuit has ruled on the issue of whether a defendant must have been convicted of one of the enumerated crimes in §2332(g)(b)(5).  The Fourth Circuit has held:

> "We therefore think it is reasonable to understand §3A1.4 as applying to a circumstance such as this one, in which one of the counts of conviction is alleged to be a federal crime of terrorism. . . . Violation of §2332b is one of the crimes enumerated in the definition of "federal crime of terrorism."

*United States v. Hammoud,* 381 F.3d 316, 356 (4th Cir. 2004).

By itself, this passage from *Hammoud* gives the impression that a conviction of one of the enumerated crimes in §2332(g)(b)(5) is necessary for §3A1.4 to apply.  The advent of the Sixth Circuit holding in *US v. Graham,* however, is enabling a growing, yet misguided, trend among the circuits that a defendant need *not* be convicted of one of the enumerated offenses of §2332(b)(g)(5) as long as his or her intent was to involve or promote or involve a federal crime of terrorism. In the absence of authoritative precedent, we submit that the *Graham* case was wrong and this court should follow the explicit language of the guideline and find that a conviction is indeed required for §3A1.4 to be triggered.

In *United States v. Graham,* the Sixth Circuit held that §3A1.4 applied when the underlying crime "involved or was intended to promote" a federal crime of terrorism as defined in §2332(b)(g)(5). *United States v. Graham*, 275 F.3d 490, 516-

517 (6th Cir. 2001). As with each circuit that has interpreted §3A1.4, the Sixth Circuit recognized that the question was one of first impression and there exists a "paucity of case law" on the subject. *Id* at 513.

The *Graham* court chose to follow the district court, focusing on the "intended to promote" language of §3A1.4 in determining whether an underlying conviction of one of §2332(b)(g)(5)'s enumerated crimes was required for §3A1.4 to apply:

> "We begin with the assumption that the 'intended to promote' language means something different from the word "involved." A defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism. On this reading, the offense of conviction itself need not be a "Federal crime of terrorism."

*Id at* 516.

The Seventh Circuit also supports the no conviction required holding of *Graham.* The *Hale* case dealt with the application of §3A1.4 to a defendant member of a white supremacist organization convicted of general conspiracy to murder a federal judge. *United States v. Hale,* 448 F.3d 971, 988 (7th Cir. 2006). The Seventh Circuit rejected the defendant's argument that he must be convicted of one of the enumerated §2332(b)(g)(5) crimes in order for §3A1.4 to apply:

"§ §3A1.4 applies 'where a defendant is convicted of a federal crime of terrorism as defined by [18 U.S.C.] § §2332b(g)(5)(B) or where the district court finds that the purpose or intent of the defendant's substantive offense of conviction or relevant conduct was to promote a federal crime of terrorism as defined by § §2332b(g)(5)(B).'"

*United States v. Hale,* 448 F.3d at 988, citing *United States v. Arnaout*, 431 F.3d 994, 1001, (7th Cir. 2005); *United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004); *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001).

This Court is neither bound by, nor should it follow the lead in *Graham*. On the contrary, this Court must find that a conviction of one of the enumerated offenses in §2332(b)(g)(5) is required to trigger the enhancement.

One of the crimes with which Defendant Tubbs was charged was general conspiracy under 18 U.S.C. §371. A conviction under this statute carries with it a maximum penalty of five years imprisonment. 18 U.S.C. §371 is not one of the enumerated crimes contained in the definition of a federal crime of terrorism under §2332(b)(g)(5).

Unlike other Guidelines whose application notes specifically include conspiracies and attempts to commit specifically enumerated crimes, §3A1.4 does not. A literal reading of §3A1.4 would not include convictions for conspiracy under 18 U.S.C. §371. In support of this interpretation, this court should pay particular notice to the salient reasoning used by the dissenting judge in *Graham*, that

conviction of one of the enumerated offenses listed in §2332b(g)(5) is absolutely

necessary to the application of §3A1.4:

> "As I will describe, the evolution of § §3A1.4, applicable case
> law as well as the legislative history of 18 U.S.C. § §2332b(g)(5), assists us in
> deciding on the parameters of a 'Federal crime of terrorism.' To look to
> analogous provisions of the guidelines is unnecessary; § §3A1.4 is explicit in
> its definition of a 'Federal crime of terrorism;' there must be a conviction of
> one of the enumerated offenses in 18 U.S.C. § §2332b(g)(5)(B) before there
> can be an enhancement under § §3A1.4.

*United States v. Graham,* dissenting opinion, 275 F.3d at 525.

The reason the dissent opposed the application of §3A1.4 without a

conviction of a §2332(b)(g)(5) crime is that, to do so would violate the intent of

Congress and the Sentencing Commission to keep the definition of terrorism narrow

so as not to label those defendants who do not fit the description of a terrorist:

> "To approve of the action of the district court effectively
> labels Graham a terrorist and his activity as displayed in the
> record as terroristic activity . . . and is grossly contrary to the language of 18
> U.S.C. § §2332b(g)(5) defining a 'Federal crime of terrorism,' as well as the
> Congressional intent to keep the definition narrow:
> 'in order to keep a sentencing judge from assigning a terrorist
> label to crimes that are truly not terrorist, and to adequately
> punish the terrorist for his offense, it is appropriate to define the term.' H.
> Rep. No. 104-383 (1995), at p. 114. ***
>
> *** [T]he record of the Sentencing Commission's actions
> in promulgating § §3A1.4 . . . leads to the conclusion that a conviction of one
> of the enumerated offenses listed in 18 U.S.C. § §2332b(g)(5) is an *absolute*
> *condition precedent* to the enhancement called for by § §3A1.4. Plainly, the
> legislative history of the statutes reflects a concern by Congress, much like the

concern of the delegates to the Constitutional Convention of 1787 over the definition of 'treason,' that *'terrorism' being a phrase which carries far-reaching connotations that is not to be used indiscriminately* and must be carefully defined. *See Rumbold's Dying Speech, 1685, and Jefferson's Last Words on Democracy,* 1826, William and Mary Quarterly, 3d Ser., IX (1952), 521-531."

*Id* at 536-537.

Considering the absence of precedent and the reasons set forth in the *Graham* dissent, this Court should reject the trend toward applying §3A1.4 to sentences for crimes not enumerated in §2332(b)(g)(5). If the court chooses to follow the reasoning in Graham, it will unjustly label Mr. Tubbs as a terrorist, thereby going against the congressional intent to keep the definition of terrorism narrow.

**ISSUE TWO: <u>This Court must determine that each factor giving rise to the enhancement be proven beyond a reasonable doubt, or, at least, by clear and convincing evidence.</u>**

This Court must apply the appropriate standard of proof of each fact giving rise to the application of the enhancement. Regarding general enhancements, under *Apprendi*, each fact not admitted to by a defendant that results in the enhancement of a sentence must be proven to a fact finder beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

Despite the ruling in *Apprendi,* the current standard of proof required for application of §3A1.4 varies between the circuits. Despite minor variations, the

circuits have adopted inappropriately low standards for proving facts that serve to enhance a defendant's sentence. These standards are particularly low in light of *Apprendi.* For example, the Seventh Circuit, following *Graham,* has adopted a mere preponderance of the evidence standard to prove the intent to promote a federal crime of terrorism. *United States v. Aranout*, 431 F.3d 994, 1002, citing *United States v. Graham* 275 F.3d at 517.

The *Graham* opinion is again noteworthy here, not because of the majority holding but, more importantly, because of the arguments by the dissent against such a low standard of proof:

> "Enhancement of some 250 months requires more than a
> finding by a preponderance of the evidence. At a minimum, the
> evidence should be clear and convincing if not beyond a
> reasonable doubt."

*United States v. Graham,* dissenting opinion, 275 F.3d at 525.

The dissent in *Graham* is not the only place where this court may find arguments supporting a more stringent standard of proof. The Fourth Circuit, in contrast to *Graham* and *Aranout*, discussed the Ninth Circuit's adherence to a higher standard of proof:

> "In contrast, the Ninth Circuit has imposed a heightened standard of proof
> in a number of cases. *See, e.g., United States v. Jordan,* 256 F.3d 922, 927-28
> (9th Cir. 2001) (noting that court has applied heightened standard of proof for
> seven-level and nine-level enhancements and articulating 'totality of the

circumstances' test for determining whether heightened standard should apply."

*United States v. Hammoud*, 381 F.3d 316, 355 (4th Cir. 2004).

The Ninth Circuit has held that when a sentencing factor has an "extremely disproportionate effect" on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence. [3] *United States v. Hopper,* 177 F.3d 824, 833 (9th Cir. 1999).

In determining whether a sentencing enhancement will have a disproportionate impact on the sentence as compared to the offense, the Ninth Circuit has not, "set a bright-line rule for the disproportionate impact test. Instead, we have looked at the 'totality of the circumstances,' without considering any one factor as dispositive."[4] *United States v. Jordan,* 256 F.3d at 928.

In *United States v. Valensia*, the Ninth Circuit listed several factors relating to disproportionate effect. These include:

(1) whether "the enhanced sentence fall[s] within the maximum sentence for the crime alleged in the indictment;"

---

3  See other Ninth Circuit Cases cited above: United States v. Hopper, 177 F.3d 824, 833 (9th Cir. 1999), cert. den., McKendrick v. United States, ___ U.S. ___(2000)." *United States v. Jordan*, 256 F. 3d 922, 926-28 (9th Cir. 2001)
4  United States v. Valensia, 222 F.3d 1173, 1182 (9th Cir. 2000), cert. granted, judgment vacated, and remanded by 121 S.Ct. 1222 (2001).

(2) whether "the enhanced sentence negate[s] the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment;"

(3) whether "the facts offered in support of the enhancement create new offenses requiring separate punishment;"

(4) whether "the increase in sentence[is] based on the extent of a conspiracy;"

(5) whether "the increase in the number of offense levels [is] less than or equal to four;" and

(6) whether "the length of the enhanced sentence more than double[s] the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000), cert. granted, judgment vacated, and remanded by 121 S.Ct. 1222 (2001).

Situations where the Ninth Circuit found sentences to have a disproportionate impact, requiring the sentencing court to find the facts leading to the enhancement by clear and convincing evidence are as follows:

Cases where "a seven-level adjustment increased the defendant's sentencing range from 24-30 months to 63-78 months. . . ." *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999). In *Mezas de Jesus*, the Ninth Circuit reaffirmed *Hopper* and held that a "*nine-level enhancement* on the grounds that he committed a firearm offense during an uncharged kidnapping," warranted the clear and convincing evidence standard. *Mezas de Jesus ,* 217 F.3d 638, 643-645 (9th Cir. 2000).

In contrast, situations in which the Ninth Circuit has not found a disparate impact based upon the sentencing enhancement include:

"four-level increase in sentence is not an exceptional case that requires clear and convincing evidence." *US v. Jordan* at 927. (citing *Watts*, 519 U.S. at 156-57; *United States v. Kikumura,* 918 F.2d 1084, 1100-01 (3d Cir. 1990).

A case where "two separate enhancements — each a two-level enhancement — did not show disproportionate impact." *United States v. Valensia* 222 F.3d 1173, 1182.

As a result, the Ninth Circuit in *Valensia* found that the defendant "was not deprived of due process when the district court determined the facts pertinent to the enhancements pursuant to the preponderance of the evidence standard." *United States v. Jordan* at 928 citing *Valensia* at 1183.

The *Valensia* and *Jordan* decisions, combined with the vehement dissent in *Graham*, provide this court with adequate support to require at least proof of each factor giving rise to the terrorist enhancement by clear and convincing evidence. This is true whether or not those factors were admitted to by Defendant Tubbs because the sentence, enhanced by §3A1.4, will have result in the disparate impact discussed by the Ninth Circuit.

**ISSUE THREE: <u>The definition of terrorism under §2332(b)(g)(5) should not be taken out of the statutory context of "transcending national boundaries"</u>**

The *Harris* case addressed the issue of whether the Sentencing Commission could carve the statutory definition of a federal crime of terrorism out of the context of the statute as a whole. 18 U.S.C. §2332(b) pertains specifically to "Acts of Terrorism that Transcend National Boundaries." In *Harris,* the Fifth Circuit held that:

> "The definition of a "federal crime of terrorism" in 18 U.S.C. § §2332b(g)(5), . . . encompasses many offenses, none of which has as an element requiring conduct transcending national boundaries. All that section §3A1.4 requires for an upward adjustment to apply is that one of the enumerated offenses was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

*United States v. Harris,* 434 F.3d 767, 773 (5th Cir. 2005).

The holding in *Harris* is incorrect. The definition provided in §2332(b)(g)(5) cannot be incorporated into §3A1.4 out of context of the entirety of the statute. To do so would impermissibly ignore the full text of §2332(b), discarding words as meaningless or surplus. As noted in *Aranout,* "The Guidelines must be interpreted, however, so *no words are discarded as meaningless, redundant or surplusage.*" *United States v. Aranout,* 431 F.3d at 1001, citing *Witzke v.Femal,* 376 F.3d 744, 753 (7th Cir. 2004) (finding that this court must read a statute to give effect to each word so as to avoid rendering any words meaningless, redundant, or superfluous).

Traditional rules of statutory construction require that every term should be construed as having a meaning. In drafting statutes, Congress is presumed to have used no superfluous language. *Platt v. Union Pacific Railroad Company,* 99 U.S. 48, 58 (1879). See also *Bailey v. United States,* 516 U.S. 137, 144-5 (1995) (holding each term used by Congress is presumed to have a "particular, non-superfluous meaning.")

The Eleventh Circuit also recognizes the longstanding, traditional rule of statutory construction. In *Mandhai,* the court held:

> "We must interpret a guideline "so that no words shall be discarded as being meaningless, redundant, or mere surplusage." *United States v. Canals-Jimenez,* 943 F.2d 1284, 1287 (11th Cir. 1991). A guideline's meaning is derived first from its plain language and, absent ambiguity, no additional inquiry is necessary. *See CBS Inc. v. PrimeTime, 24 Joint Venture,* 245 F.3d 1217, 1222 (11th Cir. 2001)."

*United States v. Mandhai,* 375 F.3d 1243, 1247 (11th Cir. 2004). Emphasis added.

Based upon the holdings of the United States Supreme Court, in addition to the Seventh and Eleventh Circuits, there is no choice but to read the definition of a Federal Crime of Terrorism in the context of §2332(b) as a whole. Thus, any factor used to apply §3A1.4 must be intended to promote a terrorist act, or terrorist actions that transcend national boundaries.

According to the reasoning in *Aranout* and *Witzke*, the Sentencing Commission, in choosing to use the definition contained in §2332(b)(g)(5), must

have intended that the conduct in question somehow transcend national boundaries. In fact, the Sentencing Commission subsequently expanded the definition of federal crimes of terrorism, using the statutory definition of terrorism under §2331(5), pertaining to "Domestic Terrorism." This provision, under §2331, casts a much wider net over the types of activities Congress considered to be domestic terrorism.

The term "Domestic Terrorism," under §2331(5), is defined as activities that:

"(A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any state;
(B) appear to be intended –
  (i) to intimidate or coerce a civilian population;
  (ii) to influence the policy of a government by intimidation or coercion; or
  (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and
(C) occur *primarily within the territorial jurisdiction of the United States.*"

18 U.S.C. §2331(5) emphasis added.

If §3A1.4 is understood in the context of §2332b as a whole, defining terrorist crimes as those which transcend national boundaries, the congressional intent behind the statute, and thus the intent of the Sentencing Commission, was to enhance the sentence of defendants who have been convicted of acts of international terrorism, whereas §2331(5) expressly addresses and concerns domestic terrorist activities. Clearly, under a plain reading of the two statutes, had Congress and the Sentencing Commission intended to encompass such a broad class of crimes and

defendants, as they later did, they would have supplied the definition in §2331(5) instead of §2332(b)(g)(5).

The intent behind the 1996 amendments to the enhancement was to encapsulate criminal acts that have an affect on government conduct. In the advent of the Oklahoma City bombing, Congress was concerned with more than just the destruction of government property. In enacting the 1996 AEDPA, (Public Law 104-132; codified in 18 U.S.C. §2332b(g)(5)(A)), the concern of Congress was ensuring that defendants like Timothy McVeigh have no chance in the future to continue to pursue ideologically based terrorist attacks risking death and bodily injury and threatens our nation's security and the proper function of government.

What Congress and the Sentencing Commission did not envision, were defendants like Kevin Tubbs, defendants with no long history of association with international terrorist cells, defendants who, for a short period of their lives, were vulnerable to a rhetoric that persuaded them to engage in wrongful activities, activities they never would have been involved in absent the manipulative pressure of others.

Even if a definition can be taken out of context of an entire statute, the intent of the Sentencing Commission as described above remains the same. Defendant Tubbs is not the type of defendant envisioned by §3A1.4 and this court has the

discretion to find this to be an extreme case where the defendant's circumstances take him out of the heartland of the guideline.

**ISSUE FOUR: Even if §3A1.4 applies, the district court has the discretion not to apply the enhancement if, in the aggregate, mitigating circumstances take the case/defendant out of the "heartland" of the guideline.**

In *Carmona-Nava v. United States*, (Or. 12-4-2006), the District Court took the lead from *Booker* and recognized that:

> "The sentencing court has the authority to depart downward if the court finds a mitigating circumstance exists that was 'not adequately taken into consideration by the Sentencing Committee in formulating the guidelines.' 18 U.S.C. § 3553(b) (rendered advisory by *United States v. Booker*, 543 U.S. 220 (2005))."

*Carmona-Nava v. United States,* (Or. 12-4-2006) at 9.

In addition, the decision in *Carmona-Nava* discussed how the district court may depart from the designated sentencing range for "those circumstances falling outside the 'heartland' of circumstances in typical cases."  *Id* at 10, citing *Koon v. United States*, 518 U.S. 81, 92-94 (1996).

The *Koon* case is critical to the issue of whether the enhancement under §3A1.4 should be applied in this defendant's case.  In *Koon*, the United States Supreme Court directed their attention to the history of the Sentencing Guidelines in authorizing certain types of departures:

"The Commission promulgated the United States Sentencing Guidelines, which 'specify an appropriate [sentencing range] for each class of convicted persons' based on various factors related to the offense and the offender."

United States Sentencing Commission, Guidelines Manual ch. 1, pt. A p. 1 (Nov. 1995) (1995 USSG).  Cited in *Koon v. United States* 518 U.S. 81, 92 (1996).  It should be noted that the *Koon* decision came out in the same year, 1996, as did the amendments to §3A1.4 that are at issue in this case.

According to the *Koon* court:

"Acknowledging the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances, see 28 U.S.C. § 991(b)(1)(B), Congress allows district courts to depart from the applicable Guideline range if 'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' 18 U.S.C. § 3553(b).  To determine whether a circumstance was adequately taken into consideration by the Commission, Congress instructed courts to "consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission."

*Id* at 92-93.

*Koon* treats the Sentencing Guidelines as "carving out a heartland, a set of typical cases embodying the conduct that each guideline describes."  *Id* at 93.  In order to determine which cases fall outside the proverbial "heartland," *Koon* explains that there are several types of factors that come into play when a district court is deciding whether or not to depart from the Guideline.  There are certain

factors that *Koon* explains can "never be bases for departure." *Id.* These factors are race, sex, national origin, creed, religion, socio-economic status, drug or alcohol dependence, and economic hardship. *Id* citing 1995 USSG §5H1.10, §5H1.12, §5H1.4 and 5K2.12.

With the exception of the above listed factors, *Koon* held that the Sentencing Commission, "does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that constitute grounds for departure in an unusual case." *Id.* Citing 1995 USSG Ch. 1, pt. A, intro. Comment.4(b).

The Commission, according to *Koon,* gives two reasons for its approach:

"First, it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision. *** Second, the Commission believes that despite the courts' legal freedom to depart from the guidelines, they will not do so very often. This is because the guidelines, offense by offense, seek to take account of those factors that the Commission's data indicate made a significant difference in pre-guidelines sentencing practice."

*Id* at 93-94.

According to the *Koon* court, the guidelines authorize district courts to depart in cases that feature aggravating or mitigating circumstances of a kind or degree not adequately taken into consideration by the Commission. Encouraged factors are those, "the Commission has not been able to take into account fully in formulating the guidelines." *Id* at 94, citing USSG **§** 5K2.0**.**

Examples of "encouraged" factors for downward departures, according to the Court, are those factors not taken into consideration by the guidelines. These factors include Victim provocation, which was the issue in *Koon*, as well as the potential for abuse of defendants in prison.[5] *Id* at 94-95.

Discouraged factors, on the other hand, are those:

" 'not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range.' 1995 USSG ch. 5, pt. H, intro. comment. Examples include the defendant's family ties and responsibilities, 1995 USSG § 5H1.6, his or her education and vocational skills, § 5H1.2, and his or her military, civic, charitable, or public service record, § 5H1.11.

*Id* at 95.

Based upon the Court's reading of the Commission's treatment of departure factors, the Court explained that a sentencing court considering a departure should ask the following questions:

"1) What features of this case, potentially, take it outside the Guidelines' `heartland' and make of it a special, or unusual, case?

2) Has the Commission forbidden departures based on those features?

3) If not, has the Commission encouraged departures based on those features?

4) If not, has the Commission discouraged departures based on those features?" *United States* v. *Rivera*, 994 F.2d 942, 949 (CA1 1993).

---

[5] *Koon* was dealing with the issue of departures for sentences of two officers convicted of the beating of Rodney King. The potential for abuse in prison was of particular concern because the defendants were police officers and nationally renown for their actions in the Rodney King case.

If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. *** If a factor is unmentioned in the Guidelines, the court must, after considering the 'structure and theory of both relevant individual guidelines and the Guidelines taken as a whole,' decide whether it is sufficient to take the case out of the Guideline's heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be 'highly infrequent.' 1995 USSG ch. 1, pt. 6."

*Id* at 95-96.

The district court must determine, under the above mentioned test, whether the misconduct that "occurred in the particular instance suffices to make the case atypical." *Id* at 100.

Cases considered outside the heartland of the guidelines include *United States v. Mandhai,* 375 F.3d 1243 (11th Cir. 2004). Although the Eleventh Circuit overruled the district court's downward departure based upon the defendant having committed "inchoate crimes," the court remanded the case to the district court to consider a departure under *Koon:*

"We agree with the district court, however, that the 12 level increase to Mandhai's offense level required by the terrorism enhancement prevents the penalty from fitting the crime, based on the facts of this record. The totality of the circumstances in this record, along with other factors that might not have been

brought to the Court's attention because he granted a downward departure, may be sufficient to remove the case from the Guidelines "heartland."

*United States v. Mandhai*, 375 F.3d at 1249.

The basis for a departure, according to the Eleventh Circuit, was that the defendant was a teenager who consistently had second thoughts about the jihad conspiracy. *Id* at 1250.  Moreover, despite considerable reservations about furthering the conspiracy, the defendant was pressured to continue by two other members. *Id.*  Finally, the court noted that the defendant had discontinued his activities with the conspiracy, the court finding "no record of any action by *Mandhai* between May 2001 and his indictment a year later." *Id.*

Defendant Tubbs' case is most similar to the defendant in *Mandhai.*  Mr. Tubbs did not become involved with direct action until he moved to Oregon.  His life before that time was peaceful and no different from many youths born and raised in the Midwest.  Soon after he became involved with direct actions, he, like Mandhai, began to have reservations about joining Ferguson in these activities.  Mr. Tubbs advised Mr. Ferguson that he wished to no longer participate in direct actions.  Also like the defendant in *Mandhai*, any involvement he had after expressing his wishes to distance himself were the result of pressure from particular participants, particularly Mr. Ferguson, who wished to further the alleged conspiracy.  Strikingly

similar to *Mandhai* is the fact that Mr. Tubbs completely disengaged from Mr. Ferguson's group in 2001 and had no involvement whatsoever in illegal direct actions between that time and his arrest in 2006.

In addition, like the defendants in *Koon,* Kevin Tubbs faces abuse in prison. Throughout these proceedings, Mr. Tubbs has endured threats, as has his fiancée, Michelle Page. In an Earth Liberation Front journal article, the author, imprisoned for releasing mink and foxes, identifies Kevin Tubbs as a "snitch" and an "enemy;" someone "to be feared." *Earth First Journal*, May-June 2006. The author states:

> "For the sake of clarity, let us be uncomfortably honest: to snitch is to take a life. By words and by weapons, each day lives are taken in the most egregious of crimes. When this happens in the courtroom, we call it 'cooperation.' I call it violence and I call anything done to keep an informant out of the courtroom 'self-defense.'" *Id.*

Michelle Page has received emails with similar tones, such as the one cited below:

> "As you may be aware, there has been much speculation over the past few days that Kevin has become a police informant . . . below is a statement ELP has released in response to all of the reaction to the cop's testimony (at Kevin's bail hearing). Can I ask you, do you know what exactly Kevin has said to the police about Daniel [McGowan]?
>
> I realize this will come as a shock to you, as it did to everyone else, and it means that any hope Kevin has of getting support whilst in prison is almost nil. . ."

Kevin's full and open cooperation with the federal government in this case has rendered him a target for retaliation among radical environmental groups, many

of whose members are currently incarcerated for similar illegal actions.  Already, newspaper articles and magazines saying Kevin cooperated with the government and labeling Kevin as a "snitch" and a "rat" and police informant have been passed around the jails and federal correctional institutions.  This fact places Kevin in great danger of physical violence and harm.  This Court should use its best efforts at preventing, or limiting, the potential for abuse in prison by granting a downward departure based upon the reasoning in *Koon*; that prison abuse constitutes circumstances not taken into consideration by Congress or the Sentencing Commission and is an encouraged factor when considering a downward departure.

CONCLUSION

For all reasons discussed above, neither Mr. Tubbs, nor any of the defendants in this case should be labeled as a terrorist.  This Court must not apply the terrorist enhancement because first, for §3A1.4 to apply, the defendant must be convicted of a crime enumerated in 18 U.S.C. §2332b(g)(5).  Second, this court must require proof of each factor giving rise to an application of §3A1.4 beyond a reasonable doubt, or at the very least, by clear and convincing evidence.  Third, the definition contained in 18 U.S.C. §§2332b(g)(5) cannot be taken out of context of §§2332b as a whole.  Finally, even if this court determines that §3A1.4 technically applies to Defendant Tubbs, this court also has the discretion, authority and support of the

United States Supreme Court to refuse to apply the enhancement in cases such as this one, where the facts take the case out of the heartland of §3A1.4.

It is worthwhile noting that the prosecution has openly admitted that Kevin has cooperated with authorities, accepted responsibility for his crimes and has lived quietly and law abidingly during the past five years in Eugene. AUSA Engdall admitted to the Seattle Times on July 22, 2006 regarding Mr. Tubbs:

"I think this individual has moved away from the movement and has been law abiding. And that makes a difference,"

The essence of these sentencing issues is artfully stated by the Southern District Court of New York, reasoning that the goal of rehabilitation:

"cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment."

*United States v. Carvajal*, 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005) emphasis added.

The government is just wrong as to the length of time Kevin Tubbs should be locked away from society. Further, the impact on the conditions of his confinement while incarcerated by the BOP if branded as a terrorist must not be allowed to occur. For all reasons articulated in this Memorandum, we plead that this Court reject the

arguments of the government and reject the application of U.S.S.G. §3A1.4 to Kevin Tubbs' sentence.

Respectfully submitted this 4th day of May, 2007.

/s/ Marc Friedman
Marc P. Friedman OSB# 89244
Attorney at Law

CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of May, 2007, I caused to be served on Kirk Engdall, Assistant United States Attorney, a true and complete copy of the foregoing DEFENDANT KEVIN TUBBS' MEMORANDUM ON THE APPLICATION OF U.S.S.G. §3A1.4 and Exhibits by electronic case filing.


                              \_\_\_\_/s/ Marc Friedman_____

                              Marc P. Friedman, OSB No. 89244

                              Attorney for Petitioner